# STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

**Jeremy Lyle Shultz,**
**Petitioner Below, Petitioner**

**FILED**

**October 20, 2017**

RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**vs)  No. 16-0934** (Kanawha County 13-P-362)

**David Ballard, Warden,**
**Mount Olive Correctional Complex,**
**Respondent Below, Respondent**

## MEMORANDUM DECISION

Petitioner Jeremy Lyle Shultz, by counsel Edward L. Bullman, appeals the Circuit Court of Kanawha County's "Final Order," entered on September 2, 2016, denying his petition for a writ of habeas corpus. Respondent David Ballard, Warden, Mount Olive Correctional Complex, by counsel David A. Stackpole, filed a response.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

In 2011, a jury convicted petitioner of kidnapping, first-degree robbery, and conspiracy. The victim of petitioner's crimes was Danny Nance, who was employed by Prestige Delivery Service to deliver pharmaceuticals to medical clinics in the Kanawha County area. The evidence at trial revealed that in the morning of April 27, 2010, the victim had delivered pharmaceuticals to Cabin Creek Health Clinic when a man, later identified as petitioner, stopped him as he exited the clinic. Petitioner directed the victim at gunpoint to get into his delivery van and the two proceeded to Sharon Hollow. Once at Sharon Hollow, petitioner and the victim came upon a white van with James Gravely and Sherri Sampson Gravely inside. They took the victim's cellular phone and threw his keys on the ground; bound the victim's hands and feet with plastic ties; took the remaining pharmaceuticals from the victim's delivery van and put them in the white van; and drove away in the van. After a short time, the victim freed himself and found his keys. He drove to the Cabin Creek Health Clinic and called the police.

State Police Trooper Scott Pettry reported to the clinic and interviewed the victim. Trooper Pettry then contacted Detective Don Scurlock, who had been involved in an ongoing investigation regarding medication theft in the area. The investigation led to a man named Curtis

1

Wilson, who owned a white van matching the description given by the victim.[1] Mr. Wilson informed the police that he loaned his van to petitioner on the Monday before the robbery and that he owed a drug debt to petitioner in the amount of approximately $5,000, which would be cancelled if he allowed petitioner to borrow the van.

Detective Scurlock had identified petitioner as a person of interest in his investigation. Trooper Pettry compiled a photo lineup and presented it to the victim, and the victim identified petitioner as the man who ordered him into his delivery van and drove him to Sharon Hollow. The victim indicated that petitioner was wearing a dark-colored coat with a hood over his head; however, his face was exposed. Additionally, at trial, the victim was able to identify tattoos on petitioner's arm because petitioner had pushed his sleeves up while driving the delivery van.

Police also interviewed Mr. Gravely, who was incarcerated on an unrelated charge. Mr. Gravely admitted to his involvement in the crimes and implicated petitioner and Ms. Sampson Gravely, his ex-wife, as well. Mr. Gravely told the police that he and Ms. Sampson waited in Mr. Curtis' van while petitioner kidnapped the victim. Mr. Gravely stated that Ms. Sampson stayed in the van while he and petitioner transferred the pharmaceuticals from the victim's van. Finally, Mr. Gravely specified the location where they threw stolen totes and pharmaceuticals over a hillside. Trooper Pettry went to the location and found totes, ointments, and creams; however, police never recovered the stolen narcotic drugs. Trooper Pettry then arrested petitioner, who denied any involvement in the crimes. Petitioner was scheduled to be released from parole on or about the day of his arrest.[2]

Mr. Gravely and Ms. Sampson pled guilty under plea agreements. At petitioner's trial, however, Mr. Gravely did not implicate petitioner in the crimes; rather, he testified that he and Ms. Sampson waited in the white van for the drugs to arrive, but was unaware of the identity of the third person involved. Mr. Gravely admitted that he named petitioner when interviewed by Trooper Pettry, but claimed he did so only because Trooper Pettry promised him that he would not be implicated if he named petitioner. Trooper Pettry denied pressuring Mr. Gravely to implicate petitioner.

In his defense, petitioner intended to call an alibi witness, Paul Martin. Mr. Martin reported to the courthouse under a subpoena, but left prior to testifying due to an alleged illness. Alicia Slater, petitioner's girlfriend, testified that petitioner returned home around 2:30 a.m. from Columbus, Ohio, on the morning of the robbery and did not leave the house until 11:30 a.m. Like Mr. Gravely, Ms. Sampson did not implicate petitioner. She testified that Mr. Gravely was the man who kidnapped the victim, and that she and another man, Mikey Ward, waited in Mr. Curtis' white van for the drugs to arrive. She testified that petitioner had no involvement in the crimes. Finally, petitioner testified and denied any involvement in the crimes. Petitioner claimed that he had been in Columbus, Ohio until 2:00 a.m. on the morning of the crimes; denied that he

---

[1] Mr. Curtis testified that he used to work for Prestige Delivery Service and began selling narcotics from the deliveries. He testified that he admitted to the thefts after being caught.

[2] Petitioner had previously pled guilty to attempted breaking and entering and had served a one-to-three year sentence in an unrelated incident.

had ever been charged with any drug-related crimes in the past; and denied that he would do anything to jeopardize his impending release from parole.

Petitioner also called Dr. David Clayman, psychologist, to testify as an expert in the field of eyewitness identification. Dr. Clayman was unfamiliar with the specific facts of the case. The aim of his testimony was to address, generally, the problems that can occur with eyewitness identifications and photographic lineups. However, contrary to petitioner's theory of defense, Dr. Clayman opined that, when a victim identifies a perpetrator from a photographic lineup given only one day after an incident, the likelihood of contamination is low.

The jury convicted petitioner of kidnapping and recommended that he receive mercy. The jury also convicted petitioner of first-degree robbery and conspiracy. The circuit court sentenced petitioner to life in prison, with mercy, for kidnapping, to run consecutively with a ten-year term for first-degree robbery and a one to five-year term for conspiracy. Petitioner appealed to this Court, which affirmed the convictions. *State v. Shultz,* No. 11-1494, 2013 WL 1632517 (W.Va. Apr. 16, 2013) (memorandum decision).[3]

In July of 2013, petitioner filed a petition for a writ of habeas corpus, which he amended in August of 2014. He alleged that his trial counsel was ineffective as evidenced by his (1) introduction of petitioner's prior felony conviction, parole status, and other bad character evidence at trial; (2) failure to object to the use of impeachment evidence as evidence of guilt and failing to request a *Caudill*[4] instruction as to the proper weight to be given to a guilty plea by a co-defendant; (3) failure to object to the display of petitioner's tattoo; (4) failure to investigate the testimony of Dr. David Clayman; (5) failure to present Paul Martin as an alibi witness; (6) failure to object to the State commenting upon petitioner's post-arrest *Miranda* silence; and (7) failure to conduct an adequate voir dire.[5] Petitioner also alleged that he was denied a fair trial as a result of the cumulative effect of these errors. Petitioner subsequently amended his petition to claim an *Apprendi*[6] violation of his Sixth Amendment right to trial by jury[7] and to allege that the trial court erred in its determination of mitigating sentencing factors under West Virginia Code § 61-2-14a(b)(3) and (4).

---

[3] On direct appeal, petitioner argued that (1) display of his arm tattoo was more prejudicial than probative; (2) display of his regional jail identification bracelet, caused by the display of the tattoo, was overly prejudicial; (3) the kidnapping charge was incidental to the robbery and should have been dismissed; (4) his sentence was disproportionate; and (5) the trial court violated his due process rights by failing to consider various alternative punishments under West Virginia Code § 61-2-14a.

[4] *State v. Caudill,* 170 W.Va. 74, 289 S.E.2d 748 (1982).

[5] Petitioner later abandoned the voir dire claim.

[6] *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.E.2d 435 (2000).

[7] Respondent states that petitioner's habeas counsel acknowledged that his *Apprendi* argument was contrary to West Virginia case law.

3

The circuit court held an omnibus hearing on December 14, 2015, at which Paul Martin, petitioner, and John Mitchell Jr. (petitioner's trial counsel) testified. Mr. Martin testified that he was unable to testify at petitioner's trial because he was suffering from walking pneumonia and bronchitis. He claimed that he and petitioner were together in Columbus, Ohio until 1:00 or 2:00 a.m. on the morning of the crimes, and that he spent that night at petitioner's residence. Petitioner testified that he did not consent to his counsel calling Dr. Clayman as a witness and that his counsel did not involve him in or explain any of the strategic decisions made in his defense. Mr. Mitchell testified that his theory of defense was that petitioner did not commit the crimes and had nothing to hide, which explained his decision not to object to the display of petitioner's tattoo and the references to petitioner's parole status. Mr. Mitchell adopted the strategy that petitioner would not have involved himself in the crimes because it would jeopardize his impending release from parole. Mr. Mitchell testified that petitioner consented to proceeding without Mr. Martin's testimony, rather than seeking a continuance of the trial. Finally, Mr. Mitchell testified that he spoke with Dr. Clayman prior to his testimony and was aware that not all of Dr. Clayman's testimony was favorable, but was willing to call him as a witness anyway in order to overcome the victim's eyewitness identification of petitioner.

By order entered on September 2, 2016, the circuit court denied the habeas petition, and this appeal followed. This Court reviews appeals of circuit court orders denying habeas corpus relief under the following standard:

> In reviewing challenges to the findings and conclusions of the circuit court in a habeas corpus action, we apply a three-prong standard of review. We review the final order and the ultimate disposition under an abuse of discretion standard; the underlying factual findings under a clearly erroneous standard; and questions of law are subject to a *de novo* review.

Syl. Pt. 1, *Mathena v. Haines*, 219 W.Va. 417, 633 S.E.2d 771 (2006).

On appeal, petitioner raises the same arguments that he presented in the habeas proceeding before the circuit court, with the exception of his claim that he should have been entitled to a lesser sentence because of the mitigating factors set forth in West Virginia Code § 61-2-14a. However, we find that this claim has been previously adjudicated, and rejected, in petitioner's direct appeal of his conviction and sentence to this Court. Under West Virginia Code § 53-4A-1(a), a habeas petitioner is not entitled to relief where the alleged grounds for relief have been "previously and finally adjudicated or waived in the proceedings which resulted in the conviction and sentence . . . or in any other proceeding or proceedings which the petitioner has instituted to secure relief from such conviction or sentence." Thus, we reject petitioner's challenge to his sentence.

As to petitioner's remaining assignments of error, we find no error or abuse of discretion by the circuit court. Our review of the record supports the circuit court's decision to deny petitioner post-conviction habeas corpus relief based on these alleged errors, which were also argued below. Indeed, the circuit court's order includes well-reasoned findings and conclusions as to the assignments of error raised on appeal. Given our conclusion that the circuit court's order and the record before us reflect no clear error or abuse of discretion, we hereby adopt and

4

incorporate the circuit court's findings and conclusions as they relate to petitioner's assignments of error raised herein and direct the Clerk to attach a copy of the circuit court's September 2, 2016, "Final Order" to this memorandum decision.

For the foregoing reasons, we affirm.

Affirmed.

**ISSUED:** October 20, 2017

**CONCURRED IN BY:**

Chief Justice Allen H. Loughry II
Justice Robin Jean Davis
Justice Margaret L. Workman
Justice Menis E. Ketchum
Justice Elizabeth D. Walker

*16-0934*
*Pee.*
*9.19*

## IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

JEREMY LYLE SHULTZ

    *Petitioner,*

v.

                                13-P-362
                                Judge Jennifer Bailey

DAVID BALLARD, WARDEN,
MOUNT OLIVE CORRECTIONAL CENTER,

    *Respondent.*

### FINAL ORDER

Comes now the respondent warden, by counsel, Laura Young, Assistant Prosecuting Attorney and submits the following proposed findings of fact, conclusions of law and disposition. Factual recitations are from both the trial transcript and the omnibus habeas hearing. Additionally referenced are materials contained in the file in the underlying criminal action.

### I.

### FINDINGS OF FACT

1. The petitioner was indicted by the Kanawha County Grand Jury during the May 2010 term of court for the felony offenses of kidnaping, first degree robbery and conspiracy. The petitioner elected to go to trial.

2. Although the petitioner originally cited as ineffective assistance of counsel the failure of trial counsel to conduct an adequate *voir dire*, that claim was explicitly withdrawn by habeas counsel and the petitioner at the omnibus habeas corpus hearing held in this matter on December 14, 2015.

3. Danny Nance, the victim in the case, was the first person to testify on behalf of the State. (Trial Transcript at 94.) Mr. Nance worked for Prestige Delivery Service and had been working

1

there for about four to six weeks before the robbery, which occurred on April 27, 2010. (*Id.* at 97.) His duties and responsibilities consisted of delivering pharmaceuticals to pharmacies and health centers. He drove his own minivan, which was unmarked, to deliver the pharmaceuticals. (*Id.* at 97-98.)

4. On April 27, 2010, Mr. Nance was delivering controlled substances to the Cabin Creek Health Clinic. After making that delivery, he saw a man sitting on a bench in front of the clinic. He was wearing a dark-colored coat and a hood over his head. (*Id.* at 99.) As Mr. Nance opened his van door, a voice behind him asked if he knew where Montgomery General Hospital was. When Mr. Nance turned around, the man had pulled a gun on him. (*Id.*)

5. The man directed Mr. Nance to get into the van and when he did so, he was bound with plastic ties. They drove up Sharon Hollow Road and were followed by another van containing two other people who were involved in the robbery. They took his car keys and his cell phone. They emptied out the totes from Mr. Nance's van into the other van. (*Id.* at 100.)

6. Mr. Nance was able to describe the gun that one of the robbers held on him. It was a large caliber, semi-automatic handgun with a blue tint to it. (*Id.* at 101.) He was also able to describe the man he first encountered at Cabin Creek Health Center. Mr. Nance described him as being about six feet tall with short hair. He was wearing a coat with a hood on it but he never covered his face. (*Id.* at 102.)

7. The second van that was being driven by the perpetrators was a white, Chevrolet cargo-type van. Mr. Nance was unable to see the man's face in the second van. That perpetrator kept something—possibly a shirt—over top of his face. (*Id.* at 105.) Mr. Nance did remember that there were two people in that white cargo van. (*Id.*) After they had filled up the cargo van with the totes of pharmaceuticals, the man who had first held Mr. Nance at gunpoint told Mr. Nance

2

that when he reported the robbery "it better be three fucking niggers" who had committed the robbery because if not, he was going to come after Mr. Nance. (*Id.* at 108.) The three perpetrators then left in the cargo van. (*Id.*)

8. It took Mr. Nance about fifteen minutes to free himself from his ties. He then had to find his keys as they had been thrown on the ground by the robbers. After finding his keys, Mr. Nance drove himself back to the health center and called the police. (*Id.* at 109.)

9. During trial, Mr. Nance identified the Petitioner as the person who took him at gunpoint from the Cabin Creek Health Center. When asked about how sure he was, Mr. Nance testified:

> I'm sure. I seen, I mean, he didn't bother covering his face. I was in that
> van for 10 minutes looking straight at him wondering what his next plan was.

(*Id.*) Mr. Nance also testified that he was approximately three feet away from the Petitioner in the van. (*Id.* at 161.)

10. After meeting with police, Mr. Nance identified the Petitioner from a photo lineup. (*Id.* at 110.) He also identified the Petitioner at the preliminary hearing that was held in magistrate court. (*Id.*) At the preliminary hearing, Mr. Nance testified that he had not remembered seeing any tattoos. However, at trial Mr. Nance was also able to describe tattoos on the Petitioner's arms. He specifically remembered because the Petitioner kept pushing the sleeves of his coat up so he could drive Mr. Nance's van. (*Id.* at 120.)

11. Counsel for the state requested that the petitioner show his arms—and tattoos-to the jury. Defense counsel did not object to the tattoo display, but did move for a mistrial. The basis for the motion for mistrial was that the display revealed his jail identification band. That motion was denied. (*Id.* at 121.) Although the position of the petitioner in relation to the jury was not

3

specifically detailed in the trial record, it was clarified at the habeas hearing that the petitioner stood at counsel table for the display.

12. Scott Brown also testified for the State. (*Id.* at 190.) Mr. Brown was the pharmacy director at Cabin Creek Health Systems. (*Id.* at 191.) Mr. Brown encountered Mr. Nance at approximately 8:00 or 8:30 on the morning of the robbery. He was agitated and visibly upset. Mr. Brown also testified that a former employee of the delivery company, Mr. Wilson, who was Petitioner's co-defendant, had been fired relating to a robbery complaint that had occurred about two to three weeks prior to the robbery of Mr. Nance. (*Id.* at 191-192; 199-200.)

13. Sergeant S.M. Pettry of the West Virginia State Police testified that he responded to a call at the Cabin Creek Health Clinic in reference to a robbery complaint. (*Id.* at 202.) As part of his investigation, Sgt. Pettry learned that Curtis Wilson, a former employee of the delivery company, owned a white Chevrolet cargo van. (*Id.* at 205.) Sgt. Pettry also accompanied Mr. Nance to the location where Mr. Nance had been transported. He described it as Sharon Hollow Road and it was approximately two to three miles from Cabin Creek Health Center. It is an isolated area with no known residences. (*Id.* at 210-211.)

14. During his investigation, Sgt. Pettry learned that Captain Don Scurlock with the Nitro Police Department had interviewed Curtis Wilson. Based upon that interview, Captain Scurlock informed Sgt. Pettry that the Petitioner was a person of interest in the robbery. (*Id.* at 213.)

Sgt. Pettry then met with Capt. Scurlock and prepared a photo line-up that included the Petitioner's photograph. Upon showing that photo lineup to Mr. Nance, Mr. Nance chose the Petitioner's photograph. (*Id.* at 214.)

4

15. The next day, Sgt. Pettry met with Curtis Wilson who provided Sgt. Pettry with a statement implicating himself and Petitioner in the robbery. Curtis Wilson also implicated a person named James Gravely. (*Id.* at 215-216.)

16. Sgt. Pettry then obtained a statement from James Gravely. Sgt. Pettry testified at trial that Mr. Gravely admitted his involvement in Mr. Nance's robbery and that Petitioner had contacted him to commit the robbery. (*Id.* at 217-218.) Sgt. Pettry further testified that Gravely had outlined how they committed the robbery and what happened to the totes that had been stolen from Mr. Nance's van. (*Id.* at 218-219.) While defense counsel objected to the admission of the recorded interview, he did not object to the State's questioning of Sgt. Pettry regarding the statement. (*Id.* at 216.)

17. On cross-examination, defense counsel elicited from Sgt. Pettry that when he arrested Petitioner on May 6, 2010, he located Petitioner at the parole office. (Trial transcript, Feb. 8, 2011 at p. 10-11.) Petitioner was being released from parole that day. (*Id.* at 11.) On cross-examination, Sgt. Pettry testified that Petitioner never admitted to the crime but instead denied any involvement in the crime. (*Id.* at p. 13.) Sgt. Pettry further testified that another person, Sherry Sampson, was involved in the robbery. Ms. Sampson is the ex-wife of Darren Gravely and while she ultimately pled guilty and admitted to being in the second van, she never gave Sgt. Pettry a recorded statement. (*Id.* at 18.)

18. Lisa Belmont-York testified for the State. Ms. York worked at Cabin Creek Health Clinic as a patient assistance coordinator. She was working the morning of the robbery. She observed someone sitting on the bench outside of the building. He had a medium build and was wearing a hood on top of his head. (*Id.* at 27.) Despite not having ever identified that person before, on cross examination, she was asked whether or not it was accurate that she couldn't

5

identify the person she saw. Ms. York replied that although she was not certain, that person might have been the petitioner.

19. Curtis Wilson, a co-defendant of Petitioner's, testified at trial. He pled guilty to a conspiracy to commit robbery regarding his involvement in Mr. Nance's robbery. He admitted that he used to work for Prestige Delivery Service and that he loaned out his van to use in the robbery. It was a white cargo van that he loaned to the Petitioner. (*Id.* at 35-37.). Wilson also testified that he assumed that Petitioner was going to do something with the van. Furthermore, Gravely had a conversation with Wilson a few weeks prior to this robbery during which Gravely wanted him to stage a robbery but Wilson refused. (*Id.* at 40.) Wilson owed the Petitioner a debt of "a couple thousand dollars." Wilson said he "assumed' that the debt would be canceled since he allowed the Petitioner to use his van. (*Id.* at 41-42.) During cross examination, defense counsel highlighted the fact that Wilson had been fired from Prestige for taking medication, had been charged and convicted of a subsequent breaking and entering, and gave inconsistent statements. (*Id.* at 43-47.)

20. On redirect, Wilson confirmed that he gave two statements to the police and in both statements, he implicated Petitioner and Gravely. (*Id.* at 59.)

21. James Darren Gravely testified on behalf of the State. (*Id.* at 69.) On direct examination, he testified that he and his wife participated in the robbery of Danny Nance, but he could not recall who the third person was who participated in the robbery. (*Id.* at 70.) He further testified that the police told him that if he said Petitioner was involved in the robbery, he himself would not be implicated in the crime. (*Id.* at 71.)

22. On direct examination, the State reminded Gravely that when he pled guilty, he was placed under oath. At the plea hearing, Gravely testified that Jeremy Schultz was involved in the

6

robbery and that they participated in the robbery together. Also, during the plea hearing, Gravely testified that he and his ex-wife waited at the Sharon Hollow Bridge for Petitioner to come back with the van. (*Id.* at 72; 75)

23. During the trial, Gravely explained the involvement of his ex-wife, Sherri Sampson, and explained what happened to the totes after they took the medication from them. (*Id.* at 76-79.) Gravely testified that they took the pain and nerve medications from the totes and threw the rest of the medications away. (*Id.* at 79.) Gravely acknowledged that he freely implicated his wife and confirmed on the witness stand that he was telling Sgt. Pettry the truth when he implicated her. (*Id.* at 80.) Gravely's statements, in court and out of court, were consistent save for his in-court denial that the petitioner was the third man involved in the robbery. As to the third man, Gravely (unbelievably) testified that he didn't know the man with whom he conspired to commit a felony, spent little time with him before agreeing to commit a capital offense, and that the third man just picked Gravely up beside the road. (*Id.* at 83.)

24. During Gravely's testimony, the State played portions of his statement to Sgt. Pettry without objection from the defense. During that statement, Gravely implicated Petitioner in the robbery. (*Id.* at 86-95.)However, Gravely was emphatic that it was Sgt. Pettry who pressured him into naming Petitioner as the third person involved in the robbery. (*Id.* at 82.) Gravely acknowledged that when he spoke to his probation offer during the presentence investigation process about the robbery, he implicated Petitioner. (*Id.* at p. 84, 97. He also conceded that he identified Petitioner's photo from a photo lineup that was presented to him by law enforcement. (*Id.* at 98)

25. On cross-examination, Petitioner's counsel established several key points with Gravely. First, he established that Gravely ran the risk that the State may withdraw his plea

7

agreement, which capped his sentence at thirty years in prison on the robbery conviction. (*Id.* at 102-104) He also established that there was more than forty minutes in between the time that Gravely signed his Miranda waiver and the time of Gravely's recorded statement. (*Id.* at 109.) According to Gravely, during that forty-minute time lapse, Sgt. Pettry promised him "[a] safety net" and that Sgt. Pettry only turned the recorder on after Gravely agreed to implicate Petitioner. (*Id.* at 117.)

26. After Gravely testified, the State recalled Sgt. Pettry to the stand. Sgt. Pettry testified that he did not know Petitioner before this robbery. It was only after Sgt. Pettry spoke to Detective Scurlock, that Petitioner became a suspect. He further testified that he did nothing to pressure Danny Nance, Curtis Wilson, or Darren Gravely to implicate Petitioner. (*Id.* at 132-134) As to the forty-minute delay, according to Sgt. Pettry, Gravely was just sitting there going back and forth about wanting to "go on the record" and make a statement. Sgt. Pettry denied that he put any pressure on Gravely, made him any promises or threatened him in any way. (*Id.* at 136- 137.)

27. As its last witness, the State called Deputy Jason Powell from the Kanawha County Sheriff's Department. Deputy Powell was working as a bailiff in the courthouse during the trial. (*Id.* at 139-140.) Deputy Powell testified that he overheard verbal communication between Petitioner and Sherri Sampson, his co-defendant. (*Id.* at 140) Petitioner asked Sampson "Did you hear what he did for me?" to which Sampson replied "Well, maybe that means you're going home." (*Id.* at 144.)

28. Before beginning its case in chief, defense counsel informed the Court and the State that one of his witnesses, Paul Martin, was ill and that hopefully, the witness would be available the following day. (*Id.* at 156.)

8

29. During opening statements, defense counsel told the jury that it planned on presenting an alibi defense—that Petitioner was in Ohio with Paul Martin, who was Petitioner's good friend. (*Id.* at 157.) Alicia Slater testified as his first witness, telling the jury that she saw Petitioner on the morning at April 27, 2010. (*Id.* at 159-160.) Specifically, she testified that she was the Petitioner's girlfriend and that they had been in bed together that morning in Dunbar. (*Id.* at 159, 161.) According to Slater, Petitioner had been to Columbus, Ohio for the weekend and had gotten back to the house around 2:30 a.m. on the 27th. (*Id.* at 161.) He was in bed when she left to take her son to school at 8:15 and was still there when she returned at 8:45. He did not leave the house until 11:30 that morning. (*Id.* at 163-164.)

30. On cross-examination, Slater testified that she and Petitioner were engaged to be married and had been since June of 2010. (*Id.* at 165-166.) She conceded that Petitioner's status impacted her financially and that the Petitioner had received some sort of insurance settlement. (*Id.* at 168.)

31. On redirect, counsel was able elicit from Slater that Petitioner received a large sum of money when he turned 21, meaning that he could afford a nice vehicle, paid his bills, and did not have to work. (*Id.* at 171.)

32. Petitioner called Macaila Lamb. Lamb is Alicia Slater's cousin and was 16 years old at the time of trial. She testified that on the morning of April 27, 2010, she went to Slater's house to borrow a pair of jeans. She went into Slater's bedroom to get the jeans and saw Petitioner lying in bed. (*Id.*) That occurred at approximately 9:00 in the morning. (*Id.* at 176; 180; 181.)

33. Sherri Sampson also testified for the Petitioner. (*Id.* at 185.) Sampson was a co-defendant of Petitioner's, along with Curtis Wilson and James Darren Gravely. (*Id.* at 186.) She is also Gravely's ex-wife. *Id.* Sampson pled guilty to Conspiracy to Commit Robbery. (*Id.* at

9

187.) According to Sampson, she and her ex-husband were on "good terms" at the time of the robbery and would do methamphetamine together. (*Id.* at 192.) Curtis Wilson loaned her and Gravely his white cargo van so that they could rob a delivery van. (*Id.* at 194.) The third person involved in the robbery was a person named Mikey, whom Sampson believed to be Mikey Ward. (*Id.* at 195.) Gravely, who knew Ward, had testified that he did not know the third robber.

34. Sampson proceeded to testify that she, Ward, and Gravely traveled to the Cabin Creek Clinic in Curtis Wilson's van. (*Id.* at 195-196.) Gravely was the one who got out of the van and had a gun on Mr. Nance, while Sampson and Ward stayed in the white van. (*Id.* at 197.) She and Ward followed Gravely and Mr. Nance until they stopped and unloaded the contents of Mr. Nance's van. (*Id.* at 198.) She described Gravely as wearing layers, including a hooded jacket. (*Id.*) After taking the drugs out of Mr. Nance's van, they all left in the white van—with Darren Gravely driving. Everyone then went their separate ways. (*Id.* at 199-200.) Sampson received one-fourth of the drugs. Sampson told that same story during her plea and during the presentence investigation. (*Id.* at 203-204.)

35. Although Sampson testified that her ex-husband, Darren Gravely, was the one who held Danny Nance at gunpoint, she admitted that Gravely is bald and has been bald for quite some time—at least since they were married. (*Id.* at 210.) As for Mikey Ward's physical appearance, Sampson testified that he has brown hair and is "not a big man." (*Id.* at 212-213.)

36. Detective Don Scurlock also testified for the defense. (*Id.* at 223.) He told the jury that he got to know Curtis Wilson through an investigation into the theft of prescription pills from Prestige Delivery Service. He then became a person of interest in the robbery of Danny Nance. (*Id.* at 225.) Although Wilson initially told law enforcement that his van had been repossessed by Sissonville Auto, the investigation later determined that to be untrue. (*Id.* at 227-228.)

10

37. Anthony Shultz, the Defendant's brother, testified at the trial. (Trial Transcript, Feb. 9, 2011 at 47.) He testified that he received a phone call from Petitioner around midnight on April 27, 2010 during which Petitioner stated he was coming back from Ohio. (*Id.* at 47.) He then saw the Petitioner around noon that day for his daughter's birthday party. (*Id.* at 48.)

38. On cross-examination, Anthony Shultz admitted that while he testified at the preliminary hearing, he never mentioned that the Petitioner had been in Ohio. (*Id.* at 49.) Furthermore, he never reported it to the police and did not know his brother's true whereabouts until he saw him at noon on the 27th. (*Id.* at 50.)

39. Petitioner then testified on his own behalf. (*Id.* at 54.) According to Petitioner, he spent the weekend prior to the robbery in Ohio. (*Id.* at 56.) He and a friend went up there to shop and he got back around 2:00 in the morning on April 27. (*Id.*) He didn't wake up until 10:30 or 11:00 that day and the first he discovered he was being charged with robbery and kidnapping was when he was at his parole office. In fact, he was at his parole office to be discharged from parole. (*Id.* at 57.)

40. As to Petitioner's testimony regarding parole, he testified that he was on parole for an attempted breaking and entering—not for any drug crimes and that he had to be routinely drug tested as part of his parole. (*Id.* at 58.) Petitioner also testified that he received $78,000.00 from an insurance settlement related to his father's death. (*Id.* at 59.) He had received the money at the age of 22. (*Id.* at 60.) He denied being a drug dealer or drug user. (*Id.* at 61.) Petitioner vehemently denied being involved in the robbery of Danny Nance. (*Id.* at 62.)

41. On cross-examination, Petitioner acknowledged that he went to prison for one to three years but that it "wasn't really a prison" and that he had been released about six months before the

11

robbery. (*Id.* at 68.) He admitted to knowing Wilson, Sampson, and Gravely but only characterized them as acquaintances, not friends. (*Id.* at 69.)

42. Petitioner was asked what his response was when the troopers questioned him. (*Id.* at 71.) He testified that when Sgt. Pettry met with him, he denied the robbery and that he requested the troopers give him a lie detector test. (*Id.* at 71.) He admitted on the stand that he did not tell Sgt. Pettry that he had been in Columbus the night before. (*Id.* at 72-73.) He also did not give Sgt. Pettry the name of the friend he visited in Columbus or Paul Martin, the friend who traveled with him to Columbus. (*Id.* at 73.) In response, Petitioner explained that he was never asked for an alibi by the trooper but instead the trooper kept insisting Petitioner "give [him] a story." (*Id.* at 74.)

43. Petitioner's credibility was sorely tested when, in front of the jury, he lied about placing four calls to his mother on the night of February 10, 2011—during the trial. (*Id.* at 78.) He initially denied making those calls but then admitted to making the calls when confronted with evidence of hearing his own voice making those calls. (*Id.* at 79.)

44. Petitioner was asked about statements he made to his girlfriend, Alicia Slater, regarding the case. Importantly, he engaged in a conversation with her about the fact that the victim identified him and it did not matter what the co-defendants testified to since the victim was still going to testify. His response to that during the conversation with Slater was, "I have a plan for that." (*Id.* at 83.)

45. On re-direct Petitioner volunteered that he has "been sitting in jail for something I didn't do for too long." (*Id.* at 86.) He also testified that after paying lawyer fees he only had about $3,000.00 of the settlement money left and therefore, did not have much to offer Alicia Slater financially. (*Id.* at 87, 91.) Petitioner also testified, after being asked by his counsel, that he did

12

not get permission from his parole officer before going to Ohio but explained that he wasn't getting into any trouble on parole so he did not think he would get into any trouble for leaving the state without permission. (*Id.* at 91.)

46. Dr. David Clayman testified as an expert witness on behalf of the Defendant. (*Id.* at 98.) Dr. Clayman is an expert in forensic psychology. (*Id.* at 101.) Regarding the specifics of the case at hand, he testified to having "no active knowledge" about the case. (*Id.* at 110.) However, the Court allowed Dr. Clayman to be asked hypothetical questions and render an opinion. (*Id.* at 115.)

47. Dr. Clayman testified in general regarding the issues with eyewitness identification. Regarding photo lineups, while there is no accurate percentage of how many people get identifications wrong on a photo lineup, Dr. Clayman testified that many people do get that identification wrong. Furthermore, many factors can influence the accuracy of photo lineups. (*Id.* at 117-120.) He also testified that when people are inaccurate in their identification, the longer that time passes, the more they believe their choice is, in fact, accurate. (*Id.* at 120.) Dr. Clayman further testified that other factors are important and can influence eyewitness identification. Those factors include "[h]igh intensity, threatening situations that last a short period of time." (*Id.* at 122.) Those situations lead to more inaccurate identifications. (*Id.*) Defense counsel then asked Dr. Clayman a hypothetical question which contained virtually the same facts as the Nance robbery. (*Id.* at 126-127.) Dr. Clayman testified that the emotional state of the victim could impact his "coding of information." (*Id.* at 129.) While he further testified that the presentment of a photo lineup the next day, would be problematic to the defense, he further discussed that the use of a weapon can impact a witness's ability to accurately recall details. (*Id.* at 129.)

13

48. After Dr. Clayman testified, the defense rested. The State then called Danny Nance in rebuttal, to which the defense objected. (*Id.* at 145.) The Court allowed him to testify during which he was shown a photo of Mikey Ward. (*Id.* at 154-155.) He did not recognize Mr. Ward and testified that he did not see him at Cabin Creek Health Clinic or at any point during the robbery. (*Id.* at 155.) The State then had Mr. Ward brought in person to the courtroom. Mr. Nance still did not recognize Mr. Ward. (*Id.* at 156.)

49. The petitioner was convicted of kidnapping, conspiracy and first degree robbery on February 10, 2011. The jury recommended mercy as to the kidnapping offense. On April 11, 2011, the petitioner was sentenced to life in the penitentiary, with the possibility of parole as to the kidnapping charge; a determinate term of ten years for robbery, to run consecutively to and not concurrently with the kidnapping sentence; and a consecutive one to five years for the conspiracy charge.

50. The petitioner filed a direct appeal with the West Virginia Supreme Court of Appeals. He asserted as error the following: (1) that displaying his tattoo was more prejudicial than probative and was cumulative; (2) that he was unduly prejudiced when the jury saw he was wearing a regional jail identification wristband; (3) that this Court erred by not dismissing the kidnapping charge as incidental to the robbery; (4) that his sentence was disproportionate; and (5) his due process rights were violated when the circuit court failed to consider various punishments under West Virginia Code section 61-2-14A.

51. The petitioner's conviction and sentence were affirmed by unanimous memorandum decision. *State v. Shultz*, 2013 WL 1632517 (April 16, 2013).

52. The petitioner, with the assistance of counsel, filed a petition, and an amended petition for writ of habeas corpus. An omnibus evidentiary hearing was held on December 14, 2015. The

14

following assertions of error are those that the petitioner is arguing: (a) Ineffective assistance of counsel by introducing the petitioner's parole status, previous felony conviction, and other "bad character" evidence; (b) Ineffective assistance of counsel in failing to object to use the of impeachment evidence as evidence of guilt and failing to request an instruction as to the limited use of impeachment evidence and failing to request a "*Caudill*" instruction as to the proper weight to be given to a guilty plea by a co-defendant; (c) Ineffective assistance of counsel by failing to object to the exhibition of petitioner's tattoos; (d) Ineffective assistance of counsel by offering the testimony of Dr. Clayman; (e) Ineffective assistance of counsel by failing to offer the alibi witness, Paul Martin; (f) Ineffective assistance of counsel for failing to object to the state's comment upon the petitioner's post arrest and post-Miranda silence; (g) cumulative error; and (h) the sentencing scheme for kidnapping is unconstitutional.

53. At the omnibus evidentiary hearing held on December 14, 2015, three witnesses testified: Paul Martin, the petitioner, and John Mitchell, Jr., one of petitioner's trial counsel. Petitioner's counsel noted that the petitioner was not going forward with his claim that *voir dire* was inadequate. Additionally, petitioner's counsel noted that the West Virginia Supreme Court has definitively decided that the West Virginia sentencing scheme as it pertains to kidnapping does not run afoul of *Apprendi;* nonetheless, petitioner wished to advance legal arguments on this issue.

54. The petitioner and counsel acknowledged that all other contentions which could have been raised, but were not, in this habeas corpus proceeding were waived.

55. Paul Martin testified. Martin's testimony was that he left with the petitioner on Friday to go to East Side, Columbus. Martin had just been released from prison. Therefore, the petitioner bought Martin new clothes. The two partied and went to strip clubs.

15

56. Martin further testified that he and the petitioner were constantly in each other's company the entire weekend, including up to and through the critical hours when the robbery was committed. They were apart for no more than an hour from Friday evening forward and attended the birthday party (testified to by other witnesses) together.

57. Martin testified he was too ill to come to court and testify, but had no explanation for why he did not contact the defense attorney after the petitioner was convicted.

58. Martin's testimony at the omnibus habeas hearing was in direct contravention to the testimony of the petitioner at trial and petitioner's girlfriend. Both petitioner and his girlfriend testified as to the trip to Ohio. However, at trial, each testified that petitioner returned home alone in the early morning hours before the robbery. There was no testimony that Martin came to petitioner's house during that early morning time period.

59. Martin's testimony about being constantly in the presence of the petitioner is not credible when it is compared to and contrasted with the testimony at trial of Ms. Slater and the other witnesses, including Ms. Lamb, who observed the petitioner at his residence, but did not see Martin there. Therefore, Martin would have been an ineffective, if not damaging witness at trial.

60. The petitioner testified at the omnibus hearing. He denied that he was ever consulted by his lawyer about any decisions whatsoever. When asked, the petitioner described his own tattoos as "prejudicial". However, the court accurately noted that the comments about prejudice were the petitioner's own, and that other than the tattoo being large, no details of the tattoo were apparent. The petitioner agreed that at trial, he had been seated at, or standing at, the defense position at counsel table, and that he was not paraded in front of the jury.

16

61. Despite his contention that he and his trial attorney did not consult as to any strategy, the petitioner acknowledged that he did want a witness to testify about eyewitness testimony, albeit he preferred an unnamed expert from New York.

62. The petitioner was unaware of any ill will or animus held toward him by either the witness Wilson or by Sergeant Pettry. The petitioner acknowledged that Martin's habeas corpus testimony about the two of them being continually in one another's company, including the critical hours before and during the robbery, was not correct.

63. Although the petitioner denied making a formal statement to the police, he did acknowledge that he did not remain silent. The petitioner agreed that the told the police that he did not commit the robbery. The petitioner agreed that he asked the police for the opportunity to take a lie detector test. The petitioner agreed that he may have told the police that he did not commit the robbery and told the police that he wanted a lie detector test on more than one occasion.

64. The petitioner was represented at trial by John Mitchell, Jr., and John Mitchell, Sr. John Mitchell, Jr., testified at the omnibus evidentiary hearing.

65. Mr. Mitchell had been practicing law for thirty or so years at the time of trial. He could not estimate the number of hearings and bench trials he had participated in. Further, he had represented perhaps hundreds of criminal defendants and had engaged in numerous jury trials.

66. Mr. Mitchell testified that he consulted with his client as to every strategic decision. With particularity, he consulted as to the testimony of Dr. Clayman because Mr. Shultz was not an indigent defendant and Shultz or his family would have paid Dr. Clayman's expert witness fees.

67. The trial strategy developed and pursued at trial was that the petitioner was innocent and had nothing to hide. The petitioner was aware of and agreed to that strategy.

17

68. It became necessary to have an eyewitness expert mid-trial after the victim successfully explained away his confusion from the preliminary hearing about whether his abductor did, or did not, have tattoos. Further, a witness from the clinic at trial remarked that although she could not be certain, she now believed (in the courtroom) that the person she saw outside the clinic the morning of the robbery might, in fact, be the petitioner.

69. Mr. Mitchell consulted with the petitioner about hiring Dr. Clayman, and the petitioner agreed. Mr. Mitchell spent time preparing Dr. Clayman to testify. While aware that Dr. Clayman had not directly been involved with the petitioner's case, the strategy was to use Dr. Clayman as an expert witness to explain how eyewitness identification can be mistaken.

70. The trial testimony revealed that the testimony of Clayman was, as often occurs, both helpful and harmful to both sides at trial. In particular, Dr. Clayman assisted the defense by explaining that many people get identification wrong, including identification from a photo line-up. If people are originally inaccurate, over time, that inaccuracy becomes reinforced. Other factors influencing identification include high intensity and threatening situations lasting a short period time. Those factors lead to more inaccurate identifications. While Dr. Clayman did acknowledge that the presentation of a photo line-up shortly after the offense would be problematic for the defense, he also testified that the use of a weapon can affect the ability to recall details and that if a witness is in an emotional state that can impact one's coding of information.

71. As noted above, the consistent trial strategy was that the petitioner was not guilty and had nothing for hide. Counsel strategically determined it was unwise to ask for a limiting instruction regarding co-defendant testimony because their in-court testimony was helpful to the petitioner. Although those two witnesses were not necessarily consistent with one another, their

18

in-court testimony was exculpatory of the petitioner, admitting their own participation in the robbery and conspiracy, but denying his involvement.

72. Strategically, trial counsel determined that he did not wish to ask for a *Caudill* instruction because, again, the testimony of the two co-defendants was helpful to the petitioner.

73. The decision to address the petitioner's parole status, and conviction, was a strategic decision to which the petitioner agreed. By demonstrating the petitioner was on parole, the jury was informed that the petitioner had clean drug screens, verifying he had no motive to be involved in a robbery to obtain controlled substances. Further, showing the petitioner had virtually completed his parole obligation and was to be released the day he was arrested for the instant offense was to demonstrate to the jury that the petitioner would not be so stupid as to commit a robbery while he was still being supervised, yet almost free of supervision.

74. As to the witness Martin, the witness was too sick to testify, and did not return to court. The petitioner was consulted about continuing the trial and agreed not to.

75. Trial counsel did not object to the cross-examination of the petitioner regarding his failure to speak to the police, other than a general denial of the offense and demand for a polygraph, because the defense strategy was always that the defense had nothing to hide, a strategy with which the petitioner was in full agreement.

76. As to the testimony from petitioner that he was never consulted as to any decision, and the testimony of counsel that the petitioner was consulted about and agreed to all strategic decisions, the court finds that the testimony of counsel was more credible than that of the petitioner.

## II.

## CONCLUSIONS OF LAW WITH DISCUSSION

1. Jurisdiction and venue are appropriately in the Circuit Court of Kanawha County.

19

2. West Virginia Code §53-4A-1 provides for post-conviction habeas relief for "[a]ny person convicted of a crime and incarcerated under sentence of imprisonment therefor who contends that there was such a denial or infringement of his rights as to render the conviction or sentence void under the Constitution of the United States or the Constitution of this State or both. . ."

3. The contentions and the grounds in fact or law must "have not been previously and finally adjudicated or waived in the proceedings which resulted in the conviction and sentence, or in a proceeding or proceedings in a prior petition or petitions under the provisions of this article, or in any other proceeding or proceedings which the petitioner has instituted to secure relief from such conviction or sentence." West Virginia Code §53-4A-1

4. West Virginia's post-conviction habeas corpus statute "clearly contemplates that [a] person who has been convicted of a crime is ordinarily entitled, as a matter of right, to only one postconviction habeas corpus proceeding." Syl. Pt. 1, *Markley v. Coleman*, 215 W.Va. 729, 601 S.E. 2d 49 (2004) (citations omitted). Such proceeding gives the Petitioner an opportunity to "raise any collateral issues which have not previously been fully and fairly litigated." *Coleman* at 732, 601 S.E.2d at 52. The initial habeas corpus hearing is *res judicata* as to all matters raised and to all matters known or which, with reasonable diligence, could have been known. Syl. Pt. 2, *Coleman, supra.*

5. The habeas corpus statute "contemplates the exercise of discretion by the court." *Perdue v. Coiner,* 156 W. Va. 467, 194 S.E.2d 657 (1973).

6. The circuit court denying or granting relief in a habeas corpus proceeding must make specific findings of fact and conclusions of law relating to each contention raised by the petitioner. *State ex rel. Watson v. Hill,* 200 W. Va. 201, 488 S.E.2d 476 (1997).

7. "Habeas corpus proceedings are civil proceedings. The post-conviction habeas corpus procedure provided for by Chapter 85, Acts of the Legislature, Regular Session, 1967, is expressly stated therein to be 'civil in character and shall under no circumstances be regarded as criminal proceedings or a criminal case.'" *State ex rel. Harrison v. Coiner*, 154 W. Va. 467, 476, 176 S.E.2d 677, 682 (1970). The burden is on the petitioner to prove his claims by a preponderance of the evidence.

8. "A habeas corpus proceeding is not a substitute for a writ of error in that ordinary trial error not involving constitutional violations will not be reviewed." Syl. Pt. 4, State *ex rel. McMannis v. Mohn*, 163 W. Va. 129, 254 S.E.2d 805 (1979). Moreover, "[t]he sole issue presented in a habeas corpus proceeding by a prisoner is whether he is restrained of his liberty by due process of law." Syl. Pt. 1, *State ex rel. Tune v. Thompson*, 151 W. Va. 282, 151 S.E.2d 732 (1966).

9. A circuit court having jurisdiction over habeas corpus proceedings has broad discretion in dealing with habeas corpus allegations. *Markley, supra* at 733, 601 S.E.2d at 53. It may deny the petition without a hearing and without appointing counsel if the petition, exhibits, affidavits and other documentary evidence show to the circuit court's satisfaction that the Petitioner is not entitled to relief. Syl. Pt. 3, *Markley, supra* A circuit court may also find that the habeas corpus allegation has been previously waived or adjudicated and if so, the court "shall by order entered of record refuse to grant a writ and such refusal shall constitute a final judgment." *Markley, supra*, at 733, 601 S.E. 2d at 53 (2004) (citations omitted). (citing W.Va. Code section 53-4A-3(a)).

10. When determining whether to grant or deny relief, a circuit court is statutorily required to make specific findings of fact and conclusions of law relating to each contention advanced by the petitioner and to state the grounds upon which each matter was determined. Syl. Pt. 4, *Markley, supra*. *See also* W.Va. Code §53-4A-3(a).

21

11. The only contention raised by the petitioner not related to ineffective assistance of counsel is an assertion that the West Virginia kidnaping sentencing scheme is unconstitutional. The petitioner contends that the sentencing scheme violates the federal constitutional dictates of *Apprendi v. New Jersey*, 530 U.S. 466 (2000.)

12. The West Virginia Supreme Court of Appeals has heretofore considered, and rejected the contention that the sentencing scheme violates *Apprendi*, or deprives an individual of his right to a trial by jury. Syllabus Point 2 of *State v. Haught*, 218 W. Va. 462, 624 S.E.2d 899 (2005) states: "Our kidnaping statute, W.Va. Code § 61-2-14a (1999), does not provide for the enhancement of a defendant's sentence beyond the statutory maximum based on additional facts found by the trial judge in violation of the constitutional right to a trial by jury as interpreted by the United States Supreme Court in *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004)."

13. The *Haught* court noted that the West Virginia statute was distinguishable from *Blakeley* in that:

> In contrast, the statutory maximum in this case, or, in other words, the maximum sentence that Appellant could receive based on the jury's findings, was life with mercy which is the sentence Appellant received. Thus, Appellant received no greater sentence than the statutory maximum. In sum, it is clear to this Court that, pursuant to the statute, any additional findings of fact made by the trial judge can only operate under the statute to *reduce* and not *enhance* a defendant's sentence.

*State v. Haught*, 218 W. Va. 462, 467, 624 S.E.2d 899, 904 (2005)

14. The contention that the petitioner's sentence violated constitutional norms was also raised in the direct appeal of this matter, and rejected.

> Lastly, we find no merit in petitioner's argument that the circuit court's application of West Virginia Code § 61–2–14A violated his due process rights. We have previously addressed the constitutionality of the statute in question and found that[o]ur kidnaping statute, W.Va.Code § 61–2–14a (1999), does not provide for

22

the enhancement of a defendant's sentence beyond the statutory maximum based on additional facts found by the trial judge in violation of the constitutional right to a trial by jury as interpreted by the United States Supreme Court in *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004). Syl. Pt. 2, *State v. Haught*, 218 W.Va. 462, 624 S.E.2d 899 (2005). As such, we find no merit in petitioner's final assignment of error. *State v. Shultz*, No. 11-1494, 2013 WL 1632517, at *3 (W. Va. Apr. 16, 2013)

15. The contention that the sentence is unconstitutional is a contention that implicates both state and federal constitutional rights. However, that contention has been definitively decided against the petitioner. Therefore, it is hereby DETERMINED that this contention affords the petitioner no relief.

16. The remaining claims in petitioner's brief address the issue of ineffective assistance of counsel in several particulars, and a claim that the errors and omissions of counsel result in cumulative error.

17. A claim of ineffective assistance of counsel implicates both federal and constitutional rights.

18. Claims of ineffective assistance begin and in large measure end with the standards set forth in *Strickland/Miller*.

19. West Virginia evaluates an ineffective assistance of counsel claim under the two-prong standard set forth by the Supreme Court of the United States in *Strickland v. Washington*. Syl. Pt. 5, *State v. Miller*, 194 W. Va. 3, 459 S.E. 2d 114 (1995) (citing *Strickland v. Washington*, 466 U.S. 668 (1984)). To succeed on such a claim, a petitioner must establish that: 1) his trial counsel's "performance was deficient under an objective standard of reasonableness; and 2) there is a reasonable probability that, but for counsel's unprofessional errors, the result would have been different." (*Id.*) "Failure to meet the burden of proof imposed by either part of the *Strickland/Miller*

23

test is fatal to a habeas petitioner's claim." *State ex rel. Vernatter v. Warden, W. Virginia Penitentiary*, 207 W. Va. 11, 528 S.E. 2d 207 (1999).

20. The *Strickland* standard is not easily satisfied. *See Miller*, 194 W. Va. at 16, 45 S.E.2d at 127 ("[T]he cases in which a defendant may prevail on the ground of ineffective assistance of counsel are few and far between."), *State ex rel. Daniel v. Legursky*, 195 W. Va. 314, 319, 465 S.E. 2d 416, 421 (1995)(ineffective assistance claims are "rarely" granted and only when a claim has "substantial merit"), *see also, Whiting v. Burt*, 395 F.3d 602, 617 (6th Cir. 2005)("Petitioners claiming ineffective assistance of counsel under *Strickland* have a heavy burden of proof.").

21. In *Miller*, the court outlined the challenge faced by a petitioner claiming ineffective assistance, noting that judicial review of a defense counsel's performance "must be highly deferential" and explaining that there is a strong presumption that "counsel's performance was reasonable and adequate." *Miller*, 194 W.Va. at 16, 459 S.E.2d at 127. Moreover, the *Miller* court held that there is a "wide range" of performance which qualifies as constitutionally-adequate assistance of counsel, stating:

> A defendant seeking to rebut th[e] strong presumption of effectiveness bears a difficult burden because constitutionally acceptable performance is not defined narrowly and encompasses a 'wide range.' The test of ineffectiveness has little or nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We only ask whether a reasonable lawyer would have acted, under the circumstances, as defense counsel acted in the case at issue.

*Id., see also Vernatter*, 207 W. Va. at 17, 528 S.E.2d at 213 ("[T]here is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . .'") (quoting *Strickland*, 466 U.S. at 689).

22. A petitioner claiming ineffective assistance must identify the specific "acts or omissions" of his counsel believed to be "outside the broad range of professionally competent

24

assistance." *See Miller*, 194 W. Va. at 17, 459 S.E.2d at 128, *State ex rel. Myers v. Painter*, 213 W. Va. 32, 35, 576 S.E.2d 277, 280 (2002)("The first prong of [the *Strickland*] test requires that a petitioner identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment")(internal quotation marks omitted).

23. The reviewing court is then tasked with determining, "in light of all the circumstances" but without "engaging in hindsight," if that conduct was so objectively unreasonable as to be constitutionally inadequate. *Miller*, 194 W. Va. at 17, 459 S.E.2d at 128.

24. Strategic choices and tactical decisions, with very limited exception, fall outside the scope of this inquiry and cannot be the basis of an ineffective assistance claim. *Legursky*, 195 W. Va. at 328, 465 S.E.2d at 430 ("A decision regarding trial tactics cannot be the basis for a claim of ineffective assistance of counsel unless counsel's tactics are shown to be so ill chosen that it permeates the entire trial with obvious unfairness.")(internal quotation marks omitted), *Miller*, 194 W. Va. at 16, 459 S.E.2d at 127 ("What defense to carry to the jury, what witnesses to call, and what method of presentation to use is the epitome of a strategic decision, and it is one that we will seldom, if ever, second guess.").

25. Identifying a mere mistake by defense counsel is not enough. *See Edwards v. United States*, 256 F.2d 707, 708 (D.C. Cir. 1958)("Mere improvident strategy, bad tactics, mistake, carelessness or inexperience do not . . . amount to ineffective assistance of counsel, unless taken as a whole the trial was a 'mockery of justice.'"). As the *Miller* court noted, "with [the] luxury of time and the opportunity to focus resources on specific facts of a made record, [habeas counsel] inevitably will identify shortcomings in the performance of prior counsel;" however, the court continued, "perfection is not the standard for ineffective assistance of counsel." *Miller*, 194 W. Va. at 17, 459 S.E.2d at 128.

25

26. Even if defense counsel's conduct is deemed objectively unreasonable, and therefore satisfies the first *Strickland* prong, that conduct does not constitute ineffective assistance unless the petitioner can also establish that the deficient conduct had such a significant impact that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." Syl. Pt. 5, *Miller, supra.* As the Supreme Court explained in *Strickland,* "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland,* 466 U.S. at 691. Thus, satisfying *Strickland's* "prejudice prong" requires a showing that counsel's deficient performance was serious and impactful enough to "'deprive the defendant of a fair trial, a trial whose result is reliable.'" *State ex rel. Strogen v. Trent,* 196 W. Va. 148 at n. 4, 469 S.E.2d 7, 12 (1996) (quoting *Strickland,* 466 U.S. at 687), *see also Myers,* 213 W. Va. at 36, 576 S.E.2d at 281 (2002) ("The second or "prejudice" requirement of the *Strickland/Miller* test looks to whether counsel's deficient performance adversely affected the outcome in a given case.").

27. There is no precise formula, applicable in all cases, that can be applied to determine if the constitutionally-inadequate conduct in question so significantly degraded the reliability of the trial such that the prejudice prong is satisfied. *See Legursky,* 195 W. Va. at 325, 465 S.E.2d at 427 ("Assessments of prejudice are necessarily fact-intensive determinations peculiar to the circumstances of each case."). But there is no question that the burden of demonstrating prejudice lies with the petitioner. *Strickland,* 466 U.S. at 693, *Legursky,* 195 W. Va. at 319, 465 S.E.2d at 421.

28. The petitioner claims that his counsel was ineffective by introducing evidence of his prior felony conviction, parole status, and other bad character evidence.

29. Trial counsel testified that the decision to introduce the parole status and prior conviction was a strategic decision. He and his client consulted about that strategy and the client agreed. The strategy was a reasonable one in view of the facts and circumstances. The act in question was a robbery obtaining controlled substances, not money. By demonstrating that the petitioner was on parole for a crime which was not similar to the instant offense, it could be conclusively inferred by the jury that the petitioner was not using drugs—as demonstrated by his clean urine screens. By demonstrating that he was due to be released from parole status within days of the crime, it could conclusively be inferred by the jury that only an idiot would commit an offense that close in time.

30. It would have been improper for the prosecution to seek to introduce the evidence under Rule 404(b), absent an *in camera* hearing where the court would rule that the evidence was relevant, and more probative than prejudicial. However, and crucially, the petitioner and his counsel made a strategic decision to introduce that evidence.

31. Under the prism of *Strickland/Miller*, in which it is presumed that counsel's performance was reasonable and adequate, and in which the review is highly deferential, and without engaging hindsight, this court determines that counsel's performance was not objectively deficient. The decision to present a "warts and all" defense in which the defense had nothing to hide was a reasonable strategic choice, with which the client agreed. The tactics were not so ill chosen that the trial was permeated with unfairness. Additionally, what defense to present is the epitome of a strategic decision.

32. Counsel's performance as to the issue of the petitioner's parole status and conviction was not objectively deficient. However, assuming for the purpose of argument only that counsel's performance was objectively deficient, the petitioner cannot satisfy the second prong of

27

*Strickland/Miller,* in that the petitioner cannot demonstrate prejudice arising from counsel's decision. The petitioner cannot demonstrate that "but for" the introduction of the parole status and conviction the result of the trial would have differed, i.e., that the petitioner would have been acquitted.

33. The evidence against the petitioner was substantial. He was unequivocally identified by the victim, Mr. Nance. That testimony, in and of itself, was sufficient to convict the petitioner. Mr. Nance's testimony was corroborated by the witness at the clinic, by Curtis Wilson, and (reluctantly) by Gravely. The introduction of evidence that the petitioner had a previous, non-violent felony conviction and was so well behaved on parole that he was due to be released did not contribute to the verdict against the petitioner.

34. Therefore, it is DETERMINED that the petitioner has failed to satisfy either prong of the *Strickland/Miller* standard with regard to counsel's strategy of introduction of the petitioner's parole status and non-violent conviction. The strategic choice was not unreasonable. Even if unreasonable, that choice did not affect the outcome of the proceedings.

35. Petitioner claims that trial counsel was ineffective in not requesting limiting instructions regarding accomplice testimony and impeachment by inconsistent statements and the failure to request a *"Caudill"* type instruction regarding the co-defendant's plea agreements.

36. Gravely's inconsistent, out of court statements were clearly admissible under West Virginia Rule of Evidence 613 for purposes of impeachment. Gravely's assertion that he only implicated the petitioner because of pressure from the trooper was belied by the tone of the recording. The *tone* of the recorded statement accurately reflecting the demeanor of the participants in the conversation is not hearsay. Additionally, Gravely laid the factual basis for his plea of guilty, a statement that was under oath, and subject to cross-examination (if needed) by the

28

participants at the plea hearing. As such, the factual basis is admissible as substantive evidence, as it is not hearsay.

37. Sherri Sampson and Curtis Wilson, along with Gravely, were co-defendants of the petitioner who had each reached plea agreements with the state.

38. As to any failure to object to the admission of the inconsistent statements:

> The defense counsel is not required to make every objection if it is reasonably clear that the objection would not affect the final outcome of the trial. Here, defense counsel allowed hearsay evidence to come in without objection in order to avoid testimony by another state's witness. "Where a counsel's performance, attacked as ineffective, arises from occurrences involving strategy, tactics and arguable courses of action, his conduct will be deemed effectively assistive of his client's interests, unless no reasonably qualified defense attorney would have so acted in the defense of an accused." Syl. pt. 21, *State v. Thomas*, 157 W.Va. 640, 203 S.E.2d 445 (1974).

*State v. Hatala*, 176 W. Va. 435, 436-37, 345 S.E.2d 310, 312 (1986)

39. Regarding a *"Caudill"* type instruction, it is settled that case law that *upon request*, a trial court must instruct the jury that the fact that a co-defendant has entered a plea may not be used for the purpose of proving the guilt of the defendant who is on trial. There is no obligation for a court, *sua sponte*, to give such instruction. However,

> The State posits that defense counsel, faced with the difficult task of dealing with the damaging testimony of an accomplice, may not want to have a *Caudill* instruction because such an instruction could emphasize the damaging testimony. In such cases the trial court could be interfering with a defendant's right to develop his own trial strategy. We agree.

*State v. Flack*, 232 W. Va. 708, 713, 753 S.E.2d 761, 766 (2013)

40. Trial counsel testified that he did not object during Gravely's testimony for two reasons. One was consistent with the "we have nothing to hide" defense strategy, with which the petitioner concurred. The other was that Gravely's in-court testimony was beneficial to the petitioner.

41. Trial counsel testified that he made a strategic decision not to request a limiting instruction regarding the use of the out of court statements only as impeachment because he did not want to give the jury the impression that the defense had anything to hide. Moreover, he did not want to emphasize the inconsistent statements. Further, he did not request a *Caudill* instruction for the same reasons.

42. Gravely's statement during the plea hearing was admissible as substantive evidence. He was placed under oath at his plea, could have been cross-examined, and testified inconsistently with his trial testimony. W. Va. Rule of Evidence 801(d)(1)(A). Therefore, it was not objectively deficient performance to fail to object to cross-examination questions based upon his plea colloquy. Under the prism of *Strickland/Miller*, in which it is presumed that counsel's performance was reasonable and adequate, and in which the review is highly deferential, and without engaging hindsight, this court determines that counsel's performance was not objectively deficient.

43. It was not objectively deficient performance to fail to object to cross-examination questions based upon the statement given to Sergeant Pettry and the probation officer. The credibility of a witness may be impeached by any party, including the party calling the witness and extrinsic evidence of a prior inconsistent statement is admissible. W. Va. Rule of Evid. 611; 613. Therefore, the statements were clearly admissible, and no reasonable practitioner would have objected to their admissibility.

44. An instruction regarding the use of the out of court statements to Pettry and the probation office could have been requested and given. However, the strategic decision not to request such an instruction was reasonable. Gravely's in-court testimony was helpful; counsel did not wish to emphasize the discrepancy with the out of court statements. Moreover, the strategic

decision not to object was consistent with the overall defense of being completely open and honest with the jury. Counsel believed that a limiting instruction might induce the jury to think the defense was trying to hide something. Moreover, a limiting instruction could well serve to highlight the testimony as opposed to minimizing the ill effects.

45. Therefore, it was not objectively deficient performance to fail to request a limiting instruction. *Hatala* and *Flack* note that there are sound strategic reasons for refraining from objecting to or requesting a limiting instruction on testimony.

46. Assuming for the purposes of discussion only that a reasonably objective practitioner would have requested a limiting instruction regarding the use of inconsistent statements for impeachment only, the court finds that the petitioner cannot satisfy the second prong of *Strickland/Miller*. That is the petitioner cannot demonstrate that the failure of counsel to request a limiting instruction affected the outcome of the proceedings. The petitioner cannot demonstrate that "but for" the failure to request a limiting instruction regarding Gravely's out of court statements the result of the trial would have differed, that is the petitioner would have been acquitted. The evidence against the petitioner was substantial. He was unequivocally identified by the victim, Mr. Nance. That testimony, in and of itself, was sufficient to convict the petitioner. Mr. Nance's testimony was corroborated by the witness at the clinic, by Curtis Wilson, and (reluctantly) by Gravely.

47. The statements to Pettry and the probation officer were consistent with Gravely's factual basis at the plea hearing. A limiting instruction would not have been given regarding the factual basis because that statement was not hearsay. A limiting instruction regarding the police and probation statements would not have affected the statement from the plea. Therefore, the jury

31

could consider the exact same information as substantive evidence which it could not consider as substantive evidence because of the source of that information.

48. Because the jury could consider the factual basis from the plea as substantive evidence, it is extraordinarily unlikely that the lack of a limiting instruction as to the other two statements contributed to the verdict. Again, in view of the substantial evidence against the petitioner, the prejudice prong of *Strickland/Miller* cannot be satisfied.

49. The same reasoning applies to the failure to request a "*Caudill*" instruction telling the jury that it could not consider the fact that the co-defendants had reached plea agreements as substantive evidence of the petitioner's guilt. It was a sound strategic decision.

> The State posits that defense counsel, faced with the difficult task of dealing with the damaging testimony of an accomplice, may not want to have a *Caudill* instruction because such an instruction could emphasize the damaging testimony. In such cases the trial court could be interfering with a defendant's right to develop his own trial strategy. We agree. *Flack, supra.*

50. Trial counsel testified that he did not request such an instruction because the in court testimony of Sampson and Gravely was helpful and not harmful. Moreover, as to Wilson, it was a reasonable strategic decision not to request such an instruction.

51. Always mindful that a reviewing court is not to engage in hindsight or second guessing when it comes to strategic decisions, and that determining what instructions to request is among the essential strategic decisions, this court finds that the failure to request a "*Caudill*" instruction was not objectively deficient performance.

52. However, again assuming for the purpose of discussion only that a reasonably objective practitioner would have requested that limiting instruction regarding the co-defendant's pleas, this court finds that the failure to request such instruction did not prejudice the petitioner, and did not, therefore, affect the outcome of the proceeding.

32

53. The jury's verdict was not based upon the co-defendant's pleas of guilty. The verdict was again based upon the very, very substantial evidence against the petitioner. The victim identified the petitioner from a lineup, at the preliminary hearing and at trial and was unequivocal in his identification. His testimony was corroborated by Curtis Wilson, Ms. Belmont-York, the physical evidence, and Gravely's testimony.

54. Therefore, this court DETERMINES that the counsel's determination not to request a limiting instruction as to the statements to Pettry and the probation officer and not to request a limiting instruction on the co-defendant's pleas was a reasonable, strategic decision. Moreover, the failure to request those instructions did not affect the outcome of the proceeding. The petitioner has satisfied neither prong of *Strickland/Miller*. The petitioner is not entitled to relief on this claim.

55. The petitioner claims that counsel was ineffective for failing to object to the display of petitioner's tattoos.

56. The display of the tattoos at trial was relevant for the purpose of identification. Mr. Nance had testified at the preliminary hearing that he did not remember the tattoos. However, he then remembered, after the preliminary hearing, that he saw something dark, a tattoo, on the petitioner's arm, and that he saw it even though the petitioner had on a jacket, because the petitioner kept shoving the sleeves of the jacket up.

57.     The display of tattoos is approved in West Virginia jurisprudence.

Ordinarily, it is not an abuse of discretion for a trial court in a criminal case to direct the accused to reveal or display the accused tattoos to a witness and to the jury at trial, where the accused tattoos are relevant to the question of the identification of the perpetrator of the offense and where the trial court has weighed the probative value of such evidence against the danger of unfair prejudice, etc. pursuant to Rules 401, 402 and 403 of the *West Virginia Rules of Evidence*. Syl. Pt. 2, *State v. Meade*, 474 S.E.2d 481, 196 W.Va. 551 (1996).

33

58.   In *State v. Creamer*, 2012 WL 3079158 (W.Va. April 16, 2012), the defendant challenged the publication of the defendant's tattoos based upon the argument that the court did not explicitly conduct a Rule 403 balancing test. *Id.* at *2. The Court noted that" [t]he action of a trial court in admitting or excluding evidence in the exercise of its discretion will not be disturbed by the appellate court unless it appears that such action amounts to an abuse of discretion." *Id.* (citation omitted). Accordingly, the Court found that the trial court had not abused its discretion by allowing the defendant's tattoos to be published to the jury. *Id.*

59.  In petitioner's direct appeal, in which the issue of the display of the tattoos was a ground for appeal, the West Virginia Supreme Court determined that it was not error for the trial court to order the petitioner to display his tattoos. The West Virginia Supreme Court upheld Petitioner's convictions and sentence. In doing so, the Court noted that it found "no error in the circuit court's decision to have petitioner display his tattoos." While the Court stated that Petitioner's counsel failed to object to the display, it further found that "petitioner has failed to establish any specific prejudicial effect from the display." *State v. Shultz*, 2013 WL 1632517 at *2 (April 16, 2013).

60.  The petitioner does not articulate any prejudice from the tattoo display. The petitioner displayed his tattoos during the habeas hearing, while he was testifying. The petitioner was on the witness stand. The petitioner was physically located much closer to the judge while testifying at the habeas hearing, than he was located to the jury at trial. The court made an attempt to observe the details of petitioner's tattoos, and could note only that the tattoos were large. The court could make no specific observation of the particulars of the tattoos. Therefore, the jury at trial likewise could not have observed the particulars of the tattoos.

34

61. It was not objectively deficient performance to fail to object to the tattoo display. Therefore, petitioner cannot satisfy the first prong of *Strickland/Miller*. Had such an objection been made, it would not have been sustained because the tattoos were admissible and relevant. Moreover, the petitioner cannot satisfy the *Strickland/Miller* prejudice prong because he articulates no prejudice from the display.

62. Therefore, the court DETERMINES that counsel was not ineffective in failing to object to the tattoos display. This claim afford the petitioner not relief.

63. The petitioner claims that trial counsel was ineffective in presenting the testimony of Dr. Clayman.

64. Trial counsel testified that the necessity for an expert witness on the issue of identification testimony from an eyewitness arose during trial because Mr. Nance successfully explained away his failure to testify at the preliminary hearing that his abductor had tattoos, and that Lisa Belmont York, who had never identified the petitioner as the individual waiting on the bench outside the clinic before trial stated during trial that while she was not completely sure, she thought the petitioner may have been the person on that bench.

65. Trial counsel testified that he consulted with the petitioner about hiring Dr. Clayman. Although the petitioner testified he was not consulted, the court finds that the testimony of trial counsel was more credible on this issue, particularly since the petitioner would have paid for the expert witness fees.

66. Trial counsel further testified that he prepared Dr. Clayman to testify at trial. His purpose in calling Clayman was not to specifically assail the eyewitness identification of Nance and Belmont-York, but to demonstrate, from an expert, how eyewitness testimony and identification from a photo lineup can be wrong.

67. Dr. Clayman's testimony did just that. Although some of Dr. Clayman's testimony was not helpful to the defense (in fact may have been harmful in some particulars), through Dr. Clayman the defense got in front of the jury that eyewitness identification does result in a certain number of cases in misidentification, that the stress of being held at gunpoint can interfere with the "coding" of information, and that the longer a person holds the belief that he has identified the correct person, the more difficult it is to convince the person he is wrong.

68. Faced with the unenviable surprise that Belmont-York was now corroborating the victim's identification, which had been swift and unequivocal, counsel made a reasonable strategic decision to attempt to dissuade the jury that it should not credit the eyewitness identification. The fact that the strategy did not work does not mean that it was ineffective.

69. Moreover, the testimony of Dr. Clayman did not affect the results of the proceeding. Again, absent Dr. Clayman's testimony the evidence against the petitioner was more than substantial.

70. Identifying a mere mistake by defense counsel is not enough. *See Edwards v. United States*, 256 F.2d 707, 708 (D.C. Cir. 1958)("Mere improvident strategy, bad tactics, mistake, carelessness or inexperience do not . . . amount to ineffective assistance of counsel, unless taken as a whole the trial was a 'mockery of justice.'"). As the *Miller* court noted, "with [the] luxury of time and the opportunity to focus resources on specific facts of a made record, [habeas counsel] inevitably will identify shortcomings in the performance of prior counsel;" however, the court continued, "perfection is not the standard for ineffective assistance of counsel." *Miller*, 194 W. Va. at 17, 459 S.E.2d at 128.

71. The petitioner fails to satisfy either prong of *Strickland/Miller*. It was a reasonable, objective strategy to combat the identification strategy, when the victim explained away a

discrepancy and Ms. Belmont York testified about her new belief that the person outside the clinic-the robber-was petitioner. Moreover, Dr. Clayman's testimony did not affect the outcome of the trial. His testimony was helpful in many respects to the petitioner. Therefore, the prejudice prong of ineffective assistance is not satisfied.

72. Calling Dr. Clayman was not ineffective assistance. Petitioner knew and agreed to the strategy to call the expert witness. Trial counsel prepared Dr. Clayman to testify. Dr. Clayman's testimony did not affect the outcome of the trial. Therefore, the court DETERMINES that this claim affords the petitioner no relief.

73. The petitioner claims that the state impermissibly cross-examined the petitioner about his post-arrest silence, and that it was ineffective assistance of counsel not to object to that line of questioning.

74. However, the petitioner did not remain silent. The petitioner volunteered on direct examination that he told the police he didn't do it, and requested a lie detector test. The petitioner testified at the habeas hearing that he did not invoke his right to remain silent, but rather—although he did not define his communication with the police as a "statement"—acknowledged that he said to the police, more than once that he didn't do it and requested from the police, more than once, a lie detector test.

75. Because there was no mention from Sgt. Pettry or Petitioner that he invoked his right to remain silent, there is no impermissible inference the jury could draw that he must be guilty because he invoked that right. Petitioner's own testimony establishes that he did not invoke his right to remain silent. Therefore, the State's further questioning regarding the issue was not improper and even if it was improper, was not error of such magnitude that excluding such evidence would have resulted in a different verdict.

37

76. This case is analogous to the "failure to speak" cases. In *State ex rel. Boso v. Hedrick,* 182 W. Va. 701, 391 S.E.2d 614 (1990), among the asserted errors of trial counsel was ineffective assistance for failing to object to cross-examination questions regarding his pretrial silence. *Boso* at 705, 391 S.E.2d at 617. Both the appellant and his mother were asked why neither had come forward before trial with the exculpatory information that the appellant was home when the crime occurred. *Id.* at 706, 391 S.E. 2d at 619. However, there is no constitutional prohibition against exploring the "failure to speak" when the government did not induce the silence. If a failure to speak occurs before a person is taken into custody and Mirandized there is no fundamental unfairness, and impeachment by prearrest silence does not violate the Fourteenth Amendment. *Id.,* citing *Jenkins v. Anderson,* 447 U.S. 231 (1980).

77. The petitioner was in custody at the time he "failed to speak", therefore making the analogy imperfect. However, the harm condemned by cross-examination on post-arrest silence, or failure to speak, is that the silence has been induced by government action and that therefore, it cannot be held against the petitioner.

78. Here, the petitioner did not invoke his right to remain silent. He volunteered information to the police that he didn't do it and wanted a lie detector test. There was no evidence before the jury that the petitioner ever invoked his right to remain silent and requested counsel.

79. Therefore, the cross-examination was not improper because the petitioner was not examined as to his post-arrest silence. He was not silent, he made a statement.

80. Further, trial counsel testified that he did not object because, as noted previously, the trial strategy was to present everything and not hide anything from the jury. The cross-examination questions did not go to the substance of the offense, but rather to the petitioner's credibility. That credibility had already been severely damaged by the petitioner's lies on the stand about the phone

38

call to his mother. Therefore, it is highly unlikely that the cross-examination questions and answers contributed to the adverse verdict.

81. In sum, as to this claim, the petitioner did not invoke his right to remain silent but instead voluntarily engaged in a colloquy with the police. Therefore, it was fair grounds for cross-examination to examine what the petitioner did or did not voluntarily state to the police. The cross-examination questions did not reveal adverse information, but went to the petitioner's credibility. The petitioner's credibility had already been damaged. The failure to object was consonant with the petitioner's trial strategy, and that strategy has already been found to be reasonable, and not objectively deficient. Moreover, the cross-examination did not contribute to the result. As noted earlier, Mr. Nance was a strong and credible witness whose testimony alone was sufficient to convict the petitioner. However, his testimony was corroborated by Wilson, Belmont York, and the physical evidence.

82. It was not objectively deficient performance to fail to object to the line of cross-examination. The objection might well have been overruled because the petitioner did not remain silent but rather volunteered information to the police—just not the specific information about which he was asked. Moreover, the failure to object, even had the objection been sustained did not prejudice the petitioner. Therefore, the petitioner has failed to satisfy either prong of the *Strickland/Miller* analysis. The court DETERMINES that the petitioner is not entitled to relief on this claim.

83. Trial counsel was not ineffective for failing to present the alleged alibi witness, Paul Martin. Mr. Martin appeared at the habeas hearing. His testimony, although in the nature of an alibi, was contradictory to the testimony of the petitioner, and therefore would not have been beneficial to the petitioner at trial.

39

84. The petitioner testified at trial that he had gone to Columbus on Friday with a friend, and returned during the very, very early hours of the morning of the robbery. The friend did not accompany the petitioner to his home. The petitioner returned home alone, and went to bed. His girlfriend testified that the petitioner went to Ohio, returned home alone, and went to bed. She further testified that he was in bed with her, that she left for a period of time, and that he was in bed when she returned. She did not testify that Martin was present. Ms. Lamb testified that she saw the petitioner in bed around 9 am the morning of the robbery. She did not testify that Martin was present. The petitioner acknowledged at the habeas hearing that Martin's testimony that he was with the petitioner continually from Friday until at least the birthday party at noon the day of the robbery was "incorrect". Martin testified that he went to the petitioner's home, took a taxi to his own home, and returned almost immediately. The petitioner acknowledged, again, that Martin's testimony was incorrect. Martin testified that the petitioner was his "brother."

85. The court finds that Martin's testimony about the "alibi", and more particularly his testimony that he was constantly with the petitioner is not credible. The petitioner acknowledged that Martin was being disingenuous about his testimony.

86. Trial counsel testified that he did not call Martin because Martin was too ill to testify. Martin corroborated that he was too ill to testify. Moreover, trial counsel testified that he consulted with his client about continuing the trial, and his client did not want to continue the trial.

87. Had a motion to continue been made, it is questionable as to whether it would have been granted. The trial was virtually complete. The evidence about the petitioner's trip to Ohio had been presented through other witnesses. Therefore, Martin's testimony was cumulative at best, and again, was contradictory to the other witnesses.

40

88. Martin's testimony at trial, if consistent with his testimony at the habeas hearing would not have been helpful to the petitioner, as it directly contradicted the testimony of the petitioner, as well as his other witnesses.

89. It was not objectively deficient performance to fail to attempt to continue the trial to have Martin present. Had Martin been present, it would not have been objectively deficient performance to fail to call him to the stand. Martin was not credible, and his testimony would have been harmful rather than helpful.

90. The result of the proceeding would not have differed had Martin testified. The jury considered and rejected "alibi" testimony which came from sources far more credible than Martin. Therefore, the petitioner cannot satisfy either prong of *Strickland/Miller*. The Court DETERMINES that this claim affords the petitioner no relief.

91. Finally, the petitioner asserts that the cumulative effect of trial counsel's errors and omissions resulted in ineffective assistance of counsel. The doctrine of cumulative errors does not apply. Where the record of a criminal trial shows that the cumulative effect of numerous errors committed during the trial prevented the defendant from receiving a fair trial, his conviction should be set aside, even though any one of such errors standing alone would be harmless error. Syl. Pt. 14, *State v. Foster*, 221 W.Va. 629, 656 S.E.2d 74 (2007). The cumulative error doctrine is not applicable without legal and/or factual basis which support the individual assignments of error. *See State v. Glaspell*, 2013 WL 3184918 (W.Va. June 24, 2013). The cumulative error analysis should evaluate only the effect of matters determined to be error, not the cumulative effect of non-errors. *State v. Knuckles*, 196 W.Va. 416, 426; 473 S.E.2d 131, 141 (1996). Because Petitioner fails to meet his burden of establishing counsels' errors in defending his case, the doctrine of cumulative errors does not apply.

41

92. As the Court has carefully considered each of the asserted claims of ineffective assistance of counsel and determined that as to each claim, counsel's performance was neither objectively deficient, nor did any error or omission affect the result of the proceeding, the doctrine of cumulative does not apply.

93. Therefore, the court DETERMINES that the claim of cumulative error affords the petitioner no relief.

94. The petitioner, in consideration of all the facts and circumstances in the underlying criminal case, clearly received that to which he was constitutionally entitled, a fair and public trial by an impartial jury of his peers. Nonprejudicial errors, if any, which may have occurred, even if considered cumulatively, would not entitle the petitioner to the request relief. The United States Supreme Court has held from March 1953 forward that a criminal defendant is entitled to a fair jury trial, not a perfect jury trial. *Lutwak v. United States,* 344 U.S. 644 (1953.)

95. All of the petitioner's claims regarding the constitutionality of the sentencing scheme as well as the claims of ineffective assistance of counsel implicate both state and federal constitutional grounds, and those claims were all argued and decided under the applicable state and federal law.

### III.

### CONCLUSION

THEREFORE, based upon a thorough and complete review of the complete contents of the criminal case file in this matter, including the trial transcripts; in consideration of the testimony at the omnibus evidentiary hearing, and considering the arguments of counsel for the petitioner and the warden both at the hearing and in written submissions, it is ORDERED that the petition seeking a writ of habeas corpus be and the same is hereby DENIED. It is further ORDERED that

42

said civil action be and the same is hereby DISMISSED. The court notes the exceptions and objections of the petitioner.

The Court ORDERS the Circuit Clerk to send certified copies of this Order to all counsel of record.

ENTERED this ___2nd___ day of September, 2016.

_JENNIFER F. BAILEY, JUDGE_

STATE OF WEST VIRGINIA
COUNTY OF KANAWHA, SS
I, CATHY S. GATSON, CLERK OF CIRCUIT COURT OF SAID COUNTY
AND IN SAID STATE, DO HEREBY CERTIFY THAT THE FOREGOING
IS A TRUE COPY FROM THE RECORDS OF SAID COURT.
GIVEN UNDER MY HAND AND SEAL OF SAID COURT THIS
DAY OF _September, 2016_
_Cathy S Gatson_ CLERK
CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

43